IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LEON SWEENY RUFFIN, Jr. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| MARTIN O'MALLEY, | : | NO.  22-2921 |
| Commissioner of Social Security[1] | : | |

**MEMORANDUM AND ORDER**

ELIZABETH T. HEY, U.S.M.J.                                        March  4, 2024

Leon Ruffin, Jr., ("Plaintiff") seeks review of the Commissioner's decision denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI").  For the reasons that follow, I conclude that the decision of the Administrative Law Judge ("ALJ") is supported by substantial evidence and affirm the Commissioner's decision.

## I.    **PROCEDURAL HISTORY**

On February 18, 2020, Plaintiff protectively filed applications for DIB and SSI, alleging that he became disabled on March 15, 2018, as a result of bipolar II disorder, major depressive disorder ("MDD"), diabetes, generalized anxiety disorder ("GAD"), and hypertension.  Tr. at 102, 103, 233, 235, 256.[2]  The applications were denied initially on December 1, 2020, id. at 156, 161, and on reconsideration on March 18, 2021.  Id. at 172,

---

[1]Martin O'Malley became the Commissioner of Social Security on December 20, 2023.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Commissioner O'Malley should be substituted for Kilolo Kijakazi as the defendant in this action.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2]I will define the relevant medical terms in discussing the medical evidence.

182.[3]  Plaintiff requested an administrative hearing, id. at 192, which took place on July

21, 2021.  Id. at 36-58.  On August 30, 2021, the ALJ found Plaintiff was not disabled.

Id. at 15-28.  On May 25, 2022, the Appeals Council denied Plaintiff's request for

review, id. at 1-3, making the ALJ's August 30, 2021 decision the final decision of the

Commissioner.  20 C.F.R. §§ 404.981, 416.1481.  Plaintiff commenced this action in

federal court on July 26, 2022, Doc. 1, and the matter is now fully briefed and ripe for

review.  Docs. 8-10.[4]

## II.   <u>LEGAL STANDARDS</u>

To prove disability, a claimant must demonstrate an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment . . . which has lasted or can be expected to last for . . . not less than twelve

months."  42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process,

evaluating:

1.     Whether the claimant is currently engaged in substantial gainful activity;

2.     If not, whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities;

3.     If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings"), 20 C.F.R. pt.

---

[3]Neither Notice of Reconsideration is dated, but the Index indicates their date as March 18, 2021.  Index, Exhs 8B & 9B.

[4]The parties consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  <u>See</u> Standing Order, In RE:  Direct Assignment of Social Security Appeals to Magistrate Judges – Extension of Pilot Program (E.D. Pa. Nov. 27, 2020); Doc. 6.

404, subpt. P, app. 1, which results in a presumption of
disability;

4.      If the impairment does not meet or equal the
criteria for a listed impairment, whether, despite the severe
impairment, the claimant has the residual functional capacity
("RFC") to perform his past work; and

5.      If the claimant cannot perform his past work,
then the final step is to determine whether there is other work
in the national economy that the claimant can perform.

See Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014); see also 20 C.F.R.

§§ 404.1520(a)(4), 416.920(a)(4).  Plaintiff bears the burden of proof at steps one through

four, while the burden shifts to the Commissioner at the fifth step to establish that the

claimant is capable of performing other jobs in the local and national economies, in light

of his age, education, work experience, and RFC.  See Poulos v. Comm'r of Soc. Sec.,

474 F.3d 88, 92 (3d Cir. 2007).

The court's role on judicial review is to determine whether the Commissioner's

decision is supported by substantial evidence.  42 U.S.C. § 405(g); Schaudeck v. Comm'r

of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999).  Therefore, the issue in this case is

whether there is substantial evidence to support the Commissioner's conclusion that

Plaintiff is not disabled.  Substantial evidence is "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion," and must be "more than a mere

scintilla."  Zirnsak, 777 F.2d at 610 (quoting Rutherford v. Barnhart, 399 F.3d 546, 552

(3d Cir. 2005)); see also Biestek v. Berryhill, 587 U.S. __, 139 S. Ct. 1148, 1154 (2019)

(substantial evidence "means only – 'such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion'") (quoting Consol. Edison Co. v. NLRB, 305

U.S. 197, 229 (1938)).  The court has plenary review of legal issues.  <u>Schaudeck</u>, 181
F.3d at 431.

## III.   <u>DISCUSSION</u>

### A.   <u>ALJ's Findings and Plaintiff's Claims</u>

The ALJ found Plaintiff had the severe impairments of depressive disorder,
anxiety disorder, prostate cancer, diabetes, and obesity.  <u>Tr.</u> at 18.  The ALJ found
Plaintiff's diabetic foot ulcer, diabetic retinopathy, asthma, and degenerative changes of
the spine to be non-severe.  <u>Id.</u> at 18-19.  Additionally, the ALJ found Plaintiff's reported
carpal tunnel syndrome was not a medically determinable impairment because it was not
established by objective medical evidence.  <u>Id.</u> at 19.  The ALJ found that Plaintiff did
not have an impairment or combination of impairments that met or equaled the Listings,
<u>id.</u>, and that he had the RFC to perform light work except that he could perform simple,
routine tasks and could occasionally interact with the public.  <u>Id.</u> at 21.  Based on the
testimony of a vocational expert ("VE"), the ALJ found that Plaintiff could perform his
past relevant work as a photocopying machine operator as it is generally performed.  <u>Id.</u>
at 28.  Therefore, the ALJ found that Plaintiff was not disabled.  <u>Id.</u>

Plaintiff claims the ALJ failed to (1) properly consider the opinions of consultative
medical examiner David B. Klebanoff, M.D., and Noah May, D.O., a treating physician,
(2) properly accommodate the mental health limitations the ALJ found in analyzing the B
criteria of the mental health listings (moderate limitation in the ability to maintain
concentration, persistence, or pace) and the limitations related to Plaintiff's ability to get
along with coworkers and peers found by the state agency consultants which the ALJ

found persuasive, and (3) properly consider the opinion of consultative psychological examiner Adrienne Gallo, Psy.D.. Docs. 8 & 10. Defendant responds that the ALJ properly considered the opinions of Drs. Klebanoff and May, and substantial evidence supports the ALJ's mental RFC finding. Doc. 9.

**B.    Plaintiff's Claimed Limitations and Testimony at the Hearing**

Plaintiff was born on July 2, 1965, and thus was 52 years old at his disability onset date (March 15, 2018), and 56 years old at the time of the ALJ's decision (August 30, 2021). Tr. at 233. Plaintiff completed four years of college and has past relevant work as a scanner technician and a residential advisor. Id. at 54, 300. At the administrative hearing, Plaintiff explained that he shifted from full-time to part-time work in 2019 because his bipolar disorder interfered with his ability to finish projects due to difficulty focusing on one thing at a time. Id. at 42-43. Physically, he has difficulty bending over, stooping, and picking up files from the file cabinet. Id. at 44. Pain in his lower back makes it difficult to sit in one place for long periods of time and he testified that he could sit for about 15 minutes before having to readjust. Id. at 44-45. Plaintiff also said that he has lost his balance on several occasions and uses a cane "every now and then." Id. at 45. Plaintiff estimated that he could lift a gallon of milk (8 pounds), but anything over that hurts his arms, wrists, and back. Id. at 46-47. Because Plaintiff also has a problem with his right shoulder, he has difficulty lifting his right arm above his head. Id. at 47. With respect to his mental impairments, Plaintiff testified that he has anxiety attacks if he is in a crowded area. Id.. He also has trouble staying on task because he forgets what he is doing. Id. at 48.

About five months prior to the administrative hearing, Plaintiff had his prostate gland removed after a prostate cancer diagnosis.  Tr. at 48.  According to Plaintiff, the cancer spread to his lymph nodes and the doctors believed he may have non-Hodgkin's lymphoma.  Id. at 48.[5]  As a result of the prostatectomy, he lost control of his bladder and has leakage when he laughs or coughs.  Id.  Plaintiff has difficulty sleeping and finds himself napping during the day.  Id. at 49.

Plaintiff lives with his elderly mother and, throughout the relevant period, took care of her, preparing her meals and administering her medication.  Tr. at 52.  In addition, throughout the relevant period, Plaintiff worked part-time as a residential advisor, working 20 hours per week.  Id. at 41-42.  On days that he was not working, he washed clothes, cleaned up and prepared meals at home.  Id. at 52-53.

At the hearing, a VE classified Plaintiff's job as a photocopying machine operator as light as customarily performed, and the residential aide job as medium work.  Tr. at 55.  When the ALJ asked the VE to consider someone of Plaintiff's age, education, and work experience, who was limited to light work, but restricted to simple, routine tasks with no more than occasional interaction with the public, the VE testified that such a person could perform the job of photocopy machine operator.  Id. at 55-56.  When asked if the person were limited to occasional handling and fingering, the VE said that all work would be precluded.  Id. at 56.  Similarly, if the person were limited to standing and walking for only two hours in an 8-hour day, the VE said the person would not be able to do the job

---

[5]As will be discussed, there is no evidence of metastasis or lymphoma in the record.

of photocopying machine operator.  Id.  In addition, if the person were off-task more than

15% of the day, he would not be employable.  Id. at 57.

### C.    Summary of the Medical Record

Plaintiff was diagnosed with diabetes in 1998, and it has never been well

controlled.  Tr. at 568 (1/26/17 – David Ganetzky, M.D., at Penn Family Care), 676

(1/9/18 – Public Health), 1250 (10/7/20 – Dr. Klebanoff).  Plaintiff has been treated with

metformin and insulin for his diabetes at various times.[6]  Tr. at 673 (11/8/16 – Isophane

and Novolin[7]), 675, 677 (1/9/18 – taking metformin, off insulin for about a year, in a

study at Penn to control blood sugar through diet and exercise, started on Levemir[8]), 682

(3/16/18 – continue metformin, adjusted Levemir), 720-21 (7/9/19 – increase Levemir,

add Novolog and add sitagliptin[9]), 727 (9/3/19 – increase insulin therapy).  He also was

diagnosed with paresthisia in both feet related to his diabetes for which he was prescribed

---

[6]Metformin is an FDA-approved antidiabetic agent that manages high blood sugar levels in type 2 diabetes patience by reducing glucose absorption from the intestines, lowers liver glucose production, and improves insulin sensitivity.  See https://www.drugs.com/metformin.html (last visited Feb. 9, 2024).

[7]Isophane Insulin (also called NPH insulin or Novolin N) is a an immediate-acting insulin that treats diabetes by increasing levels of insulin in the body to decrease blood sugar.  See https://my.clevelandclinic.org/health/drugs/20623-isophane-insulin-nph-injection (last visited Feb. 9, 2024).

[8]Levemir is a long-acting human insulin indicated to improve glycemic control. See https://www.drugs.com/pro/levemir.html (last visited Feb. 9, 2024).

[9]Novolog is a rapid acting human insulin indicated to improve glycemic control. See https://www.drugs.com/pro/novolog-injection.html (last visited Feb. 9, 2024). Sitagliptin is used with diet and exercise to improve blood sugar control.  See https://www.drugs.com/mtm/sitagliptin.html (last visited Feb. 9, 2024).

gabapentin.[10]  Id. at 734.  In December 2019, Plaintiff began complaining of swelling in

his legs for which he was prescribed hydrochlorothiazide.[11]  Id. at 732-33.

On February 8, 2020, Plaintiff was seen at the Emergency Department at Penn

Presbyterian Medical Center for pain and swelling of his left leg and a wound on the back

of his left thigh.  Tr. at 827.  He was diagnosed with a left thigh wound with cellulitis and

sepsis.[12]  Id. at 922.  On February 10, 2020, Francis E. Rosato, M.D., performed an

incision and drainage of the abscess.  Id. at 841.  Plaintiff was transferred to Care

Pavilion Nursing and Rehabilitation on February 18, 2020, for skilled nursing care and

rehabilitation.  Id. at 822.  Plaintiff was discharged from Care Pavilion on March 11,

2020.  Id. at 823.  Plaintiff was noted as "[d]oing well since [discharge]" on March 17,

2020, when he had a telehealth visit at Public Health.  Id. at 740.

On July 2, 2020, Plaintiff was seen at the Emergency Department at Penn

Presbyterian Hospital for a toe wound, and diagnosed with a diabetic wound of the first

left toe.  Tr. at 813, 816.  The wound was debrided and a topical antibiotic administered

---

[10]Gabapentin is used to treat partial seizures, nerve pain from shingles, and restless leg syndrome.  See https://www.drugs.com/gabapentin.html (last visited Feb. 9, 2024).

[11]Hydrochlorothiazide (also called HCTZ) is a diuretic that helps prevent your body from absorbing too much salt, which can cause fluid retention, used to treat edema. See https://www.drugs.com/hctz.html (last visited Feb. 9, 2024).

[12]Cellulitis is "an acute, diffuse, spreading, edematous, suppurative inflammation of the deep subcutaneous tissues and sometimes muscle, sometimes with abscess-formation.  It is usually cause by infection of a wound, burn, or other cutaneous lesion." Dorland's Illustrated Medical Dictionary, 32nd ed. (2012) ("DIMD") at 325.  Sepsis is "the presence in the blood or other tissue of pathogenic microorganisms or their toxins." Id. at 1693.

and Plaintiff was released.  Id. at 817.  Plaintiff began a series of debridements, id. at

1563 (7/15/20), 1578 (7/20/20), 1586 (7/27/20), 1599 (8/3/20), 1610 (8/10/20), 1632

(8/24/20), 1643 (9/9/20), 1654 (9/28/20), 1667 (10/28/20), 1685 (11/30/20), until

December 14, 2020, when the wound was noted as healed.  Id. at 1696.  During this

course of treatment, on July 15, 2020, Michael Troiano, D.P.M., noted necrosis[13] of the

muscle of the left foot, acute osteomyelitis[14] of the left foot, and diabetic neuropathy

associated with diabetes.  Id. at 1561.  The doctor prescribed crutches, instructed Plaintiff

to be non-weightbearing, and "[r]einforced the need for blood sugar control."  Id. at 1563.

The treatment notes indicate that during this period, Plaintiff continued to walk despite

instructions to remain non-weightbearing, id. 1586, 1610, 1635, 1646, and indicate that

Dr. Troiano "implored sugar control."  Id. at 1600, 1611, 1632, 1647.  Plaintiff was

discharged from wound care on February 17, 2021.  Id. at 1718.

Plaintiff's endocrinologist, Ying Hu, M.D., continued to describe Plaintiff's

diabetes as poorly controlled on February 4, 2021, and noted Plaintiff's confusion about

his medication doses and occasionally missing doses.  Tr. at 1334.  On April 19, 2021,

Plaintiff returned to wound care with a left toe ulcer and another of the left foot with

necrosis of the muscle.  Id. at 1732.  Dr. Troiano noted that the toe wound had reopened

about two weeks prior, debrided the toe wound and "implored [Plaintiff] for compliance

with sugars and [non-weightbearing instruction]."  Id. at 1737.  On April 26, 2021, the

---

[13]Necrosis is "the sum of the morphological changes indicative of cell death and caused by the progressive degradative action of enzymes."  DIMD at 1235.

[14]Osteomyelitis is "inflammation of bone cause by infection."  DIMD at 1347.

doctor noted four wound areas on the left leg -- thigh, anterior leg, medial leg, and toe.
Id. at 1775.  Dr. Troiano again debrided the toe wound, noted Plaintiff was ambulating on
the foot, and "[r]einforced the need for offloading and blood sugar control."  Id. at 1771.
At that time, Dr. Troiano discussed with Plaintiff that it is "only a matter of time before
he suffers limb/life threatening [infection]."  Id. at 1775.

On August 12, 2020, Plaintiff underwent a needle biopsy of the prostate gland
after having an elevated PSA.[15]  Tr. at 1192.  The biopsy confirmed a diagnosis of
prostate cancer.  Id. at 1215, 1280-82.  However, a CT scan and whole body bone scan
were negative for metastasis.  Id. at 1215, 1283.  Although originally scheduled for
October 30, 2020, id. at 1250, the prostate surgery was postponed due to Plaintiff's
uncontrolled sugars.  Id. at 1298, 1334; see id. at 1338 (Dr. Hu told Plaintiff his "glucose
needs to be between 80-200 before I can clear him for surgery.").  At the administrative
hearing, Plaintiff reported that he had his prostate removed on February 10, 2021, and
that he "found out later that the cancer itself had spread to [his] lymph nodes" and he
would have to undergo chemotherapy and radiation.  Id. at 48.[16]

---

[15]PSA (Prostate-Specific Antigen) is a protein made by the prostate gland and
found in the blood.  PSA blood levels may be higher than normal in men who have
prostate cancer, benign prostatic hyperplasia, or infection or inflammation of the prostate
gland.  See https://www.cancer.gov/publications/dictionaries/cancer-terms/def/psa (last
visited Feb. 9, 2024).

[16]The records of the prostate surgery are not contained in the administrative
record, and the treatment notes and test results contained in the record do not evidence
any metastasis.  Tr. at 1215, 1280-83.  During the surgical consult on September 4, 2020,
Gregory Diorio, D.O., advised Plaintiff that he would "most likely need" radiation and
hormone therapy in conjunction with the surgery.  Id. at 1270.

David B. Klebanoff, M.D., conducted a consultative internal medicine examination on October 7, 2020, tr. at 1250-54, during which Plaintiff did not attempt to walk on the toes of his left foot due to the wound on his left toe. Id. at 1252. The doctor noted limitations in Plaintiff's ability to walk on his heels and squat, and mildly diminished pinprick sensation in both feet. Id. at 1252-53.[17] Dr. Klebanoff noted several diagnoses -- diabetes with slowly healing ulcer of the left big toe and history of large thigh abscess on the left, diabetic neuropathy of the feet, diabetic retinopathy, hypertension, asthma, bipolar disorder, GAD, generalized depression, anxiety, nicotine abuse, and history of alcohol abuse. Id. at 1254. In a Medical Source Statement of Ability to do Work-Related Activities (Physical), the doctor opined that Plaintiff could lift and carry up to 20 pounds continuously and 21-50 pounds occasionally. Id. at 1255. In addition, Dr. Klebanoff found that Plaintiff could sit for 8 hours, and stand and walk for 5 hours each in 2-hour increments. Id. at 1256. The doctor also found limitations in Plaintiff's shoulder range of motion. Id. 1261.

On November 30, 2020, at the initial determination stage, Michael Brown, D.O., found from his review of the records that Plaintiff could frequently lift and carry 25 pounds, and occasionally lift and carry 50 pounds, and sit, stand, and walk for a total of 6 hours each in an 8-hour day. Tr. at 92-93. On March 17, 2021, at the reconsideration

---

[17]Dr. Klebanoff noted that Plaintiff did not use any ambulatory assistive devices despite the wound on his foot, tr. at 1251, and contrary to Dr. Troiano's direction that Plaintiff not be weightbearing and use crutches.

stage, Angela Teresa Walker, M.D., found, based on her review of the record, limitations consistent with those noted at the initial consideration stage.  Id. at 117-18.

Plaintiff's treating urologist, Dr. May, completed a Treating Source Statement on July 12, 2021, indicating that Plaintiff can never lift or carry any weight and can sit, stand, and walk for only an hour each in an 8-hour workday.  Tr. at 1893-94.  In addition, the doctor opined that Plaintiff could never reach overhead due to carpal tunnel of both wrists, and noted that Plaintiff should never be subject to environmental limitations such as humidity and wetness, dust/odors/fumes/pulmonary irritants, and extreme cold or heat. Id. at 1896.[18]

With respect to Plaintiff's mental health impairments, Plaintiff had a history of depression for which he was prescribed Prozac.[19]  Tr. at 676-77.  He was seen by the Behavioral Health department at Public Health on May 23, 2018, to address depressive symptoms, which were largely controlled with Prozac.  Id. at 688.  At that time Plaintiff endorsed audio/visual hallucinations, but explained that his mother had thrown out his Prozac earlier in the week.  Id. at 688-89.

---

[18]In the Environmental Limitations section, the doctor also checked a box indicating that Plaintiff should never be exposed to "other."  Tr. at 1896.  The box specifically indicates that the doctor is to write in the environmental limitation, but it is blank.  Id.  In addition, there is an internal inconsistency in the report.  Dr. May indicates that Plaintiff does not need a cane in questions 8 and 9, but then says he needs a cane on the following page.  Id. at 1894-95.

[19]Prozac is a selective serotonin reuptake inhibitor antidepressant.  See https://www.drugs.com/prozac.html (last visited Feb. 12, 2024).

Plaintiff began mental health treatment at Merakey on February 12, 2019, with diagnoses of MDD, severe with psychotic features, and unspecified anxiety disorder.  Tr. at 391.[20]  Therapist Elijah Korich noted recent hospitalizations, continued isolation, and flashbacks related to his time in the military.  Id. at 396.  The records from Public Health indicate that a psychiatrist at Merakey added Abilify[21] to Plaintiff's Prozac regimen in April 2019.  Id. at 714.  On June 3, 2019, Plaintiff reported difficulty concentrating.  Id. at 508.  On October 30, 2019, Plaintiff reported hearing voices that he knows are not real.  Id. at 477.  When Plaintiff was diagnosed with prostate cancer, his therapy sessions were focused on his anxiety about the diagnosis, surgery, and treatment.  See, e.g., id. at 1851 (9/16/20), 1856 (10/9/20), 1869 (1/13/21).  In the Treatment Plan dated January 29, 2021, as Plaintiff prepared for prostate surgery, he reported that he had resumed his prior medication and was "feeling much better" and continued to work part time.  Id. at 1840.

On October 7, 2020, Adrienne Gallo, Psy.D., conducted a consultative Mental Status Evaluation.  Tr. at 1236-39.  On mental status examination, Dr. Gallo noted that Plaintiff's affect was dysphoric and anxious, and that his attention and concentration were impaired due to anxiety and emotional distress, indicating that he was unable to perform either serial 3s or serial 7s.  Id. at 1238.  Similarly, she found Plaintiff's recent

---

[20]Although the Merakey treatment notes indicate that medication was part of Plaintiff's treatment regime, see, e.g., tr. at 511, there is no statement in the Merakey records of what medication was prescribed.

[21]Abilify is an antipsychotic used to treat bipolar I disorder, MDD, and the symptoms of psychotic conditions including schizophrenia.  See https://www.drugs.com/abilify.html (last visited Feb. 12, 2024).

and remote memory skills to be impaired, and his cognitive functioning to be below average.  Id.  Dr. Gallo diagnosed Plaintiff with unspecified schizophrenia spectrum and psychiatric disorder, unspecified depressive disorder, and unspecified anxiety disorder. Id. at 1239.  In a Medical Source Statement of Ability to Do Work-Related Activities (Mental), the doctor found that Plaintiff had moderate limitation in the abilities to understand, remember, and carry out simple instructions and to make judgments on simple work-related decisions, and marked limitation in the abilities to understand, remember, and carry out complex instructions and make judgments on complex work-related decisions.  Id. at 1240.  With respect to Plaintiff's ability to interact with others, Dr. Gallo found that Plaintiff had no limitation in his abilities to interact with supervisors and co-workers; mild limitation in the ability to respond appropriately to usual work situations and changes in routine work settings; and moderate limitation in the ability to interact with the public.  Id. at 1241.

At the initial consideration stage, Soraya Lotus Amanullah, Ph.D., found that Plaintiff suffered from schizophrenia spectrum and other psychotic disorders; depressive, bipolar, and related disorders; and anxiety and obsessive-compulsive disorders.  Tr. at 89. The doctor found from her review of the records that Plaintiff had no limitations in the ability to understand, remember or apply information; moderate limitation in the abilities to interact with others and concentrate, persist, or maintain pace, and no limitations in the ability to manage oneself.  Id.  On reconsideration, Molly Haas Cowan, Psy.D., similarly found moderate limitation in the abilities to interact with others and concentrate, persist,

or maintain pace, but found mild limitation in the abilities to understand, remember or apply information and adapt or manage oneself.  Id. at 115.

### D.   **Plaintiff's Claims**

#### 1.   Opinion Evidence – Physical Impairments - Drs. May and Klebanoff

Plaintiff argues that the ALJ failed to properly evaluate the opinions of Dr. May, Plaintiff's treating urologist who diagnosed his prostate cancer, and Dr. Klebanoff, the consultative examiner.  Doc. 8 at 3-10; Doc. 10 at 1-3.  Defendant responds that the ALJ properly applied the new regulatory framework and properly considered the opinion evidence.  Doc. 9 at 7-10.

As the parties discuss in their respective briefs, the ALJ's consideration of medical opinion evidence is governed by regulations which focus on the persuasiveness of each medical opinion.

> We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources.

20 C.F.R. §§ 404.1520c(a), 416.920c(a).[22]  The regulations list the factors to be utilized in considering medical opinions:  supportability, consistency, treatment relationship including the length and purpose of the treatment and frequency of examinations, specialization, and other factors including familiarity with other evidence in the record or an understanding of the disability program.  Id. §§ 404.1520c(c), 416.920c(c).  The most

---

[22]In contrast, the regulations governing applications filed before March 17, 2017, spoke in terms of the weight to be given each opinion, including controlling weight for the opinions of certain treating sources.  20 C.F.R. §§ 404.1527, 416.927.

important of these factors are supportability and consistency, and the regulations require the ALJ to explain these factors, but do not require discussion of the others.  Id. §§ 404.1520c(b)(2), 416.920c(b)(2).  The regulations explain that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . , the more persuasive the medical opinions . . . will be."  Id. §§ 404.1520c(c)(1), 416.920c(c)(1).  In addition, "[t]he more consistent a medical opinion(s) . . .  is with the evidence from other medical sources and nonmedical sources . . . , the more persuasive the medical opinion(s) . . . will be."  Id. §§ 404.1520c(c)(2), 416.920c(c)(2).

The change in the regulations did not change the basic rule that "[t]he ALJ must consider all the evidence and give some reason for discounting the evidence she rejects." Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (citing Stewart v. Sec'y HEW, 714 F.2d 287, 290 (3d Cir. 1983)).  When there is a conflict in the evidence, the ALJ may choose which evidence to credit and which evidence not to credit, so long as she does not "reject evidence for no reason or for the wrong reason."  Rutherford, 399 F.3d at 554; see also Plummer, 186 F.3d at 429 (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993)).

Here, as previously mentioned, Dr. May opined that Plaintiff could never lift any weight and could sit, stand, and walk for an hour each in an 8-hour workday.  The ALJ found the opinion not persuasive.

> Noah May, D.O. completed a medical source statement dated July 12, 2021. ([Tr. at 1893-96]).  His opinion is not persuasive because it is not supported by his

16

treatment records and it is not consistent with the totality of the medical evidence. For example, the opinion suggests that [Plaintiff] can never lift or carry any weight and cannot even sit for more than one hour. This is completely inconsistent with [Plaintiff's] reported activities of daily living and the work activity he performs 20 hours per week. There is no basis in the record for off task greater than 25 percent of the time or absenteeism four times or more per month. It is internally inconsistent as it states that [Plaintiff] does not need an assistive device ([id. at 1894]) but also says that he needs a cane. ([Id. at 1895]). Physical examinations were negative for significant musculoskeletal abnormalities. ([Id. at 1248-67, 1566, 1578, 1589, 1599, 1609, 1621, 1635, 1932, 1959, 1971, 1981]). There is no objective evidence to support a diagnosis of carpal tunnel syndrome. Furthermore, [Plaintiff's] hand and finger dexterity was intact. Grip strength was 5/5 bilaterally, and [Plaintiff] was able to button, zip, and tie. (Id. at 1254]). Moreover, [Plaintiff] walks 45 minutes each day and he was encouraged to add strength training. ([Id. at 1929]). Although [Plaintiff] was diagnosed with asthma, there is no indication that [Plaintiff] has had pulmonary function studies done. He does not see a pulmonologist. [Plaintiff] has not been hospitalized for acute exacerbations of asthma during the relevant period. His asthma is mild and generally uncomplicated. ([Id. at 1905]).

Id. at 27.

Plaintiff concedes that "the ALJ's rejection of any limitations related to [impairments other than prostate cancer] is understandable." Doc. 8 at 8. However, Plaintiff alleges error in the ALJ's rejection of limitations that Dr. May attributed to Plaintiff's prostate cancer, namely the limitations on lifting and carrying and sitting, standing, and walking,[23] and Plaintiff claims that the ALJ's analysis provides no insights

---

[23]In his report, Dr. May did not provide any basis for his lifting and carrying limitations, and listed prostate cancer as the basis for the sitting, standing, and walking limitations. Tr. at 1894.

into whether Dr. May's treatment supported such limitations.  Id.  Defendant responds

that the ALJ adequately explained his reasons for finding Dr. May's opinion not

persuasive.  Doc. 9 at 9-10.

Contrary to Plaintiff's assertion, the ALJ found that the limitations included in Dr.

May's assessment were not supported by his own treatment records, nor were they

consistent with the totality of the medical evidence or Plaintiff's activities.  This

conclusion is supported by substantial evidence.  Prior to the diagnosis of prostate cancer,

Dr. May treated Plaintiff for erectile dysfunction and nocturia.  Tr. at 1214 (onset in

January and March 2020, respectively).  The doctor noted normal motor strength and

tone, normal joint and muscle movement, and normal gait prior to and after the cancer

diagnosis and included no limitations on Plaintiff's activities.  Id. at 1215 (9/2/20), 1224

(6/22/20), 1227 (3/2/20).  On December 24, 2020, after his cancer diagnosis, Plaintiff

reported to Leslie Mayro, M.D., his primary care physician at Public Health, that he was

walking 45 minutes every day and she encouraged him to "include strength training" in

his routine, id. at 1935, and increase his physical activity.  Id. at 1936.  At that time,

Plaintiff also reported to Dr. Mayro that he continued to work the third shift at his job.

Id. at 1935.  Thus, the limitations included in Dr. May's assessment were not supported

by his treatment records, those of Plaintiff's primary care physician, or Plaintiff's daily

activities.

Plaintiff also complains that the ALJ did not properly consider the assessment of

Dr. Klebanoff, the consultative examiner, who opined that Plaintiff could stand and walk

for 5 hours each in 2 hour increments, occasionally reach overhead, never climb ladders

or scaffolds, and occasionally climb stairs and ramps, kneel, crouch, and crawl.  Tr. at

1256-58.[24]   Defendant responds that the ALJ adequately explained that he did not find

Dr. Klebanoff's assessment persuasive because it was not supported by Dr. Klebanoff's

examination findings and inconsistent with the totality of the evidence.  Doc. 9 at 7.

In his decision the ALJ thoroughly explained his consideration of Dr. Klebanoff's

assessment.

> Consultative medical examiner David Klebanoff, M.D.
> completed a medical source statement dated October 7, 2020.
> ([Tr. at 1250-67]).  He opined that [Plaintiff] could lift and
> carry up to 50 pounds occasionally and 20 pounds frequently.
> He also opined that [Plaintiff] [could] sit for 8 hours; stand
> [for] two hours at a time for a total of five hours in an eight-
> hour workday; and walk for two hours at a time for a total of
> five hours in an eight-hour workday.  Dr. Klebanoff
> assessed manipulative limitations of occasional overhead reaching;
> frequent reaching in all other directions; and frequent
> push/pull.  He opined that [Plaintiff] can frequently use foot
> controls.  He also noted postural and environmental
> limitations.  The undersigned finds Dr. Klebanoff's opinion
> not persuasive because it is not supported by his examination
> findings and it is not consistent with the totality of the
> evidence.  Although physical examination showed mildly
> diminished pinprick sensation on the plantar aspect and dorsal
> aspect of both feet, [Plaintiff] used no ambulatory devices and
> no support garments.  He wore no special footwear for
> diabetic neuropathy on his feet.  ([Id. at 1251]).  He declined
> to attempt to walk on toes of his left foot due to an ulcer on
> the big toe, but his stance and gait were normal.  ([Id. at
> 1252]).  He was able to walk on the toes of his right foot and
> he was able to walk on his heels.  ([Id.]).  Squat was limited

---

[24]Dr. Klebanoff found that Plaintiff could continuously lift and carry up to 20
pounds and occasionally lift 21-50 pounds, tr. at 1255, which exceeds the ALJ's
determination that Plaintiff could perform light work, which "involves lifting no more
than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10
pounds."  20 C.F.R. §§ 404.1567(b), 416.967(b).

to 60 percent due to knee pain, but there is no evidence in the record of a medically determinable knee impairment.  Straight leg raise was negative.  [Plaintiff's] hand and finger dexterity was intact.  Grip strength was 5/5 bilaterally.  [Plaintiff] demonstrated ability to button, zip, and tie.  ([Id. at 1254]).  Physical examinations elsewhere in the record were negative for significant musculoskeletal abnormalities.  ([Id. at 1566, 1578, 1589, 1599, 1609, 1621, 1635, 1932, 1959, 1971, 1981]).  A limitation to lifting no more than 20 pounds occasionally addresses [Plaintiff's] severe impairments and reasonabl[y] considers his subjective complaints.

Tr. at 27.

Plaintiff complains that "the ALJ's rejection of Dr. Klebanoff's opinion does not include a proper analysis of the regulatory factors and does not build a bridge between the evidence he cites and his rejection of the limitations identified by Dr. Klebanoff." Doc. 8 at 5.  Citing to a series of district court cases, id. at 6-7, Plaintiff argues that "the ALJ's rationale [is] too opaque to permit judicial review."  Id. at 7 (quoting Andrews v. Kijakazi, Civ. No. 20-1878, 2022 WL 617118, at *21-22 (M.D. Pa. Mar. 2, 2022)).[25] Defendant responds that "the ALJ clearly explained his findings, cited supporting record evidence, and provided sufficient analysis to permit meaningful juridical review."  Doc. 9 at 8 (citing Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004)).

In Andrews, the ALJ found a medical expert's testimony persuasive because the doctor "had the benefit of reviewing the *entire* record, including hearing testimony, and his opinion is consistent with and supported by conservative treatment notes, imagining [sic], consultative examination findings, evidence of improvement, and Andrews's daily

_____

[25]Plaintiff's pinpoint citation is incorrect as the Andrews case has pages *1-9.  See Andrews, 2022 WL 617118.  The cited quote is on page *8.

activities." 2022 WL 617118, at *7 (emphasis in original, internal record citation

omitted). The court found that the ALJ's characterization was "factually inaccurate"

because the doctor had not actually reviewed the entire record, including updated pain

management and spine treatment notes. Id. Moreover, the court found the ALJ's

discussion was lacking, noting that the ALJ stated his reasons in one conclusory sentence

without citing to the record. Id. at *8.[26]

      Here, unlike Andrews, the ALJ did not mischaracterize the evidence he reviewed,

and provided specific references to the record in support of his conclusions. Tr. at 27.

Not only did the ALJ reference Dr. Klebanoff's examination findings and Plaintiff's

statements of his activities, undermining the doctor's opinion, but also cited examination

findings by Plaintiff's primary care physician, treating urologist, podiatrist, and wound

care specialist. Id. (citing id. at 1566, 1578, 1589, 1599, 1609, 1635, 1971 (Dr. Troiano),

1621 (Mark David Binkley, M.D., wound specialist), 1932 (Dr. Mayro), 1959, 1981 (Dr.

May).[27] Rather than "opaque," the ALJ's analysis was thorough, including citations to

---

[26]The court found error in the ALJ's consideration of two other doctors' opinions
because the ALJ relied on the flawed medical expert's testimony to undermine the
opinions of those doctors. Andrews, 2022 WL 617118, at *8-9. However, the court
noted that the ALJ had addressed the supportability and consistency of these other
opinions by specifically relying on recent treatment notes, and specific consultative
examination findings. Id.
      The two other district court cases cited by Plaintiff, Doc. 8 at 6, also focus on the
ALJs' failure to articulate their reasoning regarding opinion evidence based on the
medical evidence in the record. Erica S. v. Comm'r of Soc. Sec., Civ. No. 20-6175, 2022
WL 1269788, at *6-7 (D.N.J. Apr. 28, 2022); Fleck v. Kijakazi, Civ. No. 21-75, 2022
WL 1203845, at *5-6 (W.D. Pa. Apr. 22, 2022).

[27]I note that Dr. Troiano implored Plaintiff to stay off his left foot while he had the
ulcer on his left big toe. See, e.g., tr. at 1600, 1610. However, the ALJ found that

the record.  Moreover, the ALJ's conclusion is supported by substantial evidence.  As previously discussed, Plaintiff continued to work part-time throughout the relevant period and continued to care for his elderly mother.  Id. at 41-42, 51-52.  His treatment providers encouraged him to walk and include strength training in his exercise regimen.  Id. at 1929, 1935, 1936.

2.      Consideration of Mental Health Evidence

Plaintiff argues that the ALJ's limitation to simple, routine tasks with occasional interaction with the public does not properly accommodate the paragraph B findings the ALJ made in considering the mental health listings.  Doc. 8 at 10; Doc. 10 at 3-5. Plaintiff's argument focuses on the ALJ's findings at step 3 of the sequential analysis, where the ALJ considered the B criteria of the relevant mental health listings and found that Plaintiff had moderate limitation in the abilities to interact with others and concentrate, persist, or maintain pace.  Doc. 8 at 10-11.  Defendant responds that the ALJ adequately accounted for Plaintiff's mental limitations in the RFC assessment.  Doc. 9 at 11-13.

The inter-relationship of the findings at step 3, involving the B criteria of the mental health Listings, and the RFC assessment has been the focus of several opinions in this circuit, culminating in the Third Circuit's decision in Hess v. Commissioner of Social Security, 931 F.3d 198 (3d Cir. 2019).  In Hess, the court reiterated that the findings at step 3 must be "adequately conveyed" in the RFC assessment.  Id. at 210 (quoting and

---

Plaintiff's foot ulcer had not and was not expected to last 12 consecutive months.  Id. at 18.

citing <u>Ramirez v. Barnhart</u>, 372 F.3d 546, 552 n.2 & 554 (3d Cir. 2004)).  "In short, the

functional limitation findings [of step 3] do not dictate the terms of the ALJ's statement

of the claimant's limitation in the final analytical steps.  But those findings are relevant to

that statement of the limitation, which must be sufficient to reflect all of a claimant's

impairments."  <u>Id.</u>  In order to determine the sufficiency of the ALJ's RFC assessment, "it

is essential to assess whether a valid explanation has been given for [the RFC

assessment]."  <u>Id.</u> at 213.

In <u>Hess</u>, the question was whether the ALJ's limitation to "simple tasks" in the

RFC assessment was sufficient to address the moderate difficulties in concentration,

persistence, and pace the ALJ found at step 3.  931 F.3d at 200-01.  Based on the ALJ's

discussion, the Third Circuit found that the ALJ provided "a valid explanation for her

'simple tasks' limitation . . . . [because] the ALJ explained at length and with sound

reasoning why Hess's 'moderate' difficulties in 'concentration, persistence, or pace' were

not so significant that Hess was incapable of performing 'simple tasks.'"  <u>Id.</u> at 213.

Here, the ALJ considered Plaintiff's mental health treatment and symptoms in

determining his RFC.

> As for [Plaintiff's] mental impairments, there is
> insufficient evidence to support greater restrictions in his
> [RFC].  [Plaintiff's] treatment for his mental impairments is
> very conservative.  [Plaintiff] has never been psychiatrically
> hospitalized.  ([<u>Tr.</u> at 1236]).  He was stopped [sic] seeing his
> therapist and switched to medication management only
> because he was busy taking care of his mother.  ([<u>Id.</u> at
> 1885]).  [Plaintiff] is able to maintain a part time job.
> Therapy records do not reflect any significant issues with
> [Plaintiff's] memory or cognitive functioning.  ([<u>Id.</u> at 383-
> 556, 1837-88]).  [Plaintiff] testified that he has a hard time

being around a lot of people due to anxiety and the record
reflects that he has limited social friends and sometimes
isolates.  (Id. at 383-556, 1840]).  However, he is able to shop
in stores and he is cooperative with health care examiners.
([Id. at 292, 1234-47, 1248-67]).  [Plaintiff] reported that he
has difficulty with concentrating and completing tasks.  ([Id.
at 293, 35, 58]).  On mental status examination, [Plaintiff]
completed the counting and simple calculation tasks, but he
was unable to complete serial threes from 20 or serial sevens
from 100.  ([Id. at 1238]).  He is attentive and coherent in
therapy sessions.  ([Id. at 1854, 1856, 1870]).  [Plaintiff] has
had some sleep issues and struggled with some memories of
his military service.  ([Id. at 432]).  However, [Plaintiff] is
able to care for his personal needs and he helps his mother
with household chores.  ([Id. at 287-98]).  He also works part
time.  ([Id. at 1840]).  He drives.  ([Id. at 1252]).  He was
appropriately dressed and well-groomed for his consultative
psychological evaluation.  ([Id. at 1237]).  The limitations for
working with simple, routine tasks and only occasional
interaction with the general public will adequately
accommodate [Plaintiff's] mental impairments, consistent
with the paragraph B analysis above.

Tr. at 25.[28]

With respect to Plaintiff's limitations related to concentration, persistence, and

maintaining pace, the ALJ acknowledged that Plaintiff experienced difficulties

performing the serial threes and sevens during his consultative examination.  Tr. at 25

(citing id. at 1238).  However, the ALJ noted that Plaintiff's therapy records do not

evidence any significant issues with Plaintiff's memory or functioning, id. at 25 (citing at

383-556, 1903-86), and he was able to complete the counting and simple calculation

---

[28]Although Plaintiff reported to Dr. Gallo that he had never been psychiatrically
hospitalized, tr. at 1236, Plaintiff reported to Erica Green, Psy. D., at the Behavioral
Health division of Public Health that he had a psychiatric hospitalization in the military
after combat.  Id. at 688.

tasks during his consultative examination.  Id. at 25 (citing id. at 1238).  Moreover, the

ALJ noted that Plaintiff was able to shop and continued working part-time throughout the

relevant period and cared for his elderly mother, which included ensuring that she took

her medication.  Id. at 25; see also id. at 52.  The ALJ adequately explained his

conclusion that the limitation to simple, routine tasks adequately addressed Plaintiff's

limitations in concentration, persistence, and pace.

　　　　With respect to the limitation in Plaintiff's ability to interact with others, Plaintiff

complains that the ALJ's limitation to occasional interaction with the general public did

not include any limitation related to Plaintiff's ability to get along with coworkers and

peers as noted by the state agency consultants who reviewed the record at the initial and

reconsideration stages.  Doc. 8 at 11.  Defendant responds that the ALJ adequately

explained his evaluation of Plaintiff's interaction limitations.  Doc. 9 at 12-13.

　　　　Plaintiff's argument is based on the fact that the ALJ found that the state agency

consultants' opinions were persuasive, tr. at 25-26, but failed to include any limitation

accounting for their finding that Plaintiff had moderate limitations in the ability to get

along with coworkers or peers without distracting them or exhibiting behavioral

extremes.  See id. at 75, 96-97.  However, an ALJ is "not required to adopt all of [a

medical source's] opinion solely because she found the opinion as a whole persuasive."

Wilkinson v. Comm'r of Soc. Sec., 558 F. App'x 254, 256 (3d Cir. 2014); see also

Mathews v. Kijakazi, Civ. No. 21-1140, 2022 WL 4535087, at *1 n.2 (W.D. Pa. Sept. 28,

2022) (citing Wilkinson, 558 F. App'x at 256); Titterington v. Barnhart, 174 F. App'x 6,

11 (3d Cir. 2006) ("Surveying the medical evidence to craft an RFC is part of the ALJ's

duties.").  "The critical issue is whether the ALJ adequately explains and supports her conclusions."  Mathews, 2022 WL 4535087, at *1 n.2.

Here, the ALJ adequately explained the limitation to occasional interaction with the general public without any limitation on Plaintiff's interaction with coworkers.  First, the ALJ recounted Plaintiff's testimony that "he has a hard time being around a lot of people due to anxiety."  Tr. at 20; see also id. at 47-48 (Plaintiff describing anxiety in crowds).  The ALJ also noted that Plaintiff is able to interact with other at his part-time job and shop in stores and is cooperative with his health care professionals.  Id. at 20.  These findings are supported by the record.  See, e.g., id. at 1252 (activities include shopping), 290-92 (helps with food shopping, uses public transportation), 1840 (continues to work part-time, is calling friends to pick him up from the hospital after surgery).  In addition, I note that consultative psychological examiner Dr. Gallo noted that Plaintiff had no limitations interacting with supervisors or coworkers.  Id. at 1241.[29]

Finally, Plaintiff claims that the ALJ failed to properly evaluate the opinion of mental health consultative examiner Dr. Gallo.  Doc. 8 at 11-14; Doc. 10 at 3.  Defendant responds that the ALJ adequately considered Dr. Gallo's opinion and provided sufficient support for his analysis.  Doc. 9 at 13-15.

In her assessment, Dr. Gallo found that Plaintiff had moderate limitation in the abilities to understand, remember, and carry out simple instructions and marked limitation in the abilities to understand, remember and carry out complex instructions.

---

[29]As will be discussed the ALJ found other aspects of Dr. Gallo's assessment unpersuasive.

Tr. at 1240.  As previously noted, she also found that Plaintiff had no limitations in

interacting with supervisors and coworkers, and moderate limitation in interacting with

the public.  Id. at 1241.  Review of the ALJ's decision reveals that he found certain of Dr.

Gallo's opinions persuasive, but others not persuasive based on the record as a whole.

> Consultative psychological examiner Adrienne Gallo,
> Psy.D[.,] opined on October 7, 2020 that [Plaintiff] has
> moderate to marked memory impairment. ([Tr. at 1240]).
> This opinion is no[t] persuasive because it is not supported by
> her examination findings and it is not consistent with the
> totality of the evidence.  On mental status examination,
> [Plaintiff] recalled three objects immediately, two after a
> delay, and produced six digits forward, and two backward.
> ([Id. at 1238]).  However, [Plaintiff] is able to maintain a part
> time job and take care of his mother.  Therapy records do not
> reflect any significant issues with [Plaintiff's] memory or
> cognitive functioning. ([Id. at 383-556, 1837-88]).  The
> totality of the evidence supports a mild limitation in the area
> of understanding, remembering or applying information.  Dr.
> Gallo opined that [Plaintiff] has moderate limitation
> interacting appropriately with the public and mild limitations
> in the remaining subcategories of social functioning. ([Id. at
> 1241]).  These opinions are persuasive because they are
> consistent with the evidence of record.  [Plaintiff] testified
> that he has a hard time being around a lot of people due to
> anxiety and the record reflects that he has limited social
> friends and sometimes isolates. ([Id. at 383-556, 1840]).
> However, [Plaintiff] is able to interact with others at his job.
> He is able to shop in stores. ([Id. at 292]).  [Plaintiff] was
> cooperative with health care examiners. ([Id. at 1234-47,
> 1248-67]).

Tr. at 26.

In essence, Plaintiff disagrees with the ALJ's conclusion, arguing that the

evidence of record supports Dr. Gallo's opinion that Plaintiff has moderate limitation in

the ability to understand, remember, and carry out simple instructions.  See Doc. 8 at 13

("Ultimately, the ALJ does not explain why this evidence is not entirely consistent with the limitations identified by Dr. Gallo.").  In reviewing whether substantial evidence supports the Commissioner's findings, courts may not "re-weigh the evidence or impose their own factual determinations."  Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 359 (3d Cir. 2011).  "The presence of evidence in the record that supports a contrary conclusion does not undermine the Commissioner's decision so long as the record provides substantial support for that decision."  Malloy v. Comm'r of Soc. Sec., 306 F. App'x 761, 764 (3d Cir. 2009); see also Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently.").

Here, the ALJ's conclusions regarding Dr. Gallo's assessment are supported by substantial evidence.  During the relevant period, Plaintiff continued to work part-time and care for his elderly mother.  The records from his mental health treatment professionals do not reflect any significant limitations with respect to his memory or cognitive functioning, and therapist Korich consistently noted that Plaintiff was attentive during their sessions which frequently lasted 45 minutes.  See, e.g., tr. at 688 (5/23/18 – Dr. Green – "ATTENTION:  good"), 420-21 (2/21/19 – Dr. Johnson-Dunlap – no evidence of impairment in concentration/attention), 424 (6/23/20 – "Client was open, attentive and sounded coherent."), 1851 (9/16/20 – "Client was open, attentive and exhibited moderate mood."), 1867 (12/24/20 – "Client was open, attentive and sounded coherent."), 1885 (4/20/21 – "Client was open, engaging and sounded coherent.").

Substantial evidence supports the ALJ's conclusions regarding the consideration of Dr. Gallo's opinions.

## IV.   **CONCLUSION**

The ALJ's opinion is supported by substantial evidence.  The ALJ properly considered the opinion evidence offered by Drs. Klebanoff and May regarding Plaintiff's physical impairments and limitations.  The ALJ adequately accounted for the paragraph B limitations in his RFC assessment and provided significant detail to support his assessment.  The ALJ properly evaluated the mental health opinion evidence offered by Dr. Gallo and state agency consultants who reviewed the record at the initial and reconsideration stages.

An appropriate Order follows.